IN RE PACHIN ET AL.

(No. 10510 — Decided June 10, 1988.)

*Lee C. Falke,* prosecuting attorney, and *Grant L. Wadsworth,* for appellee.

*William G. Knapp III,* for appellants.

BROGAN, J. Whenever we are asked to review a trial court's judgment in which permanent custody of children is removed from the natural parents and placed in the hands of the state, we are confronted with a difficult task, and this case is no exception. The appellants-parents, Joan and Randall Pachin, appeal from the trial court's judgment awarding permanent custody of their two minor children, Phillip and Paula Pachin, to the appellee, Montgomery County Children Services Board.

In 1985, after Paula Pachin advised her Head Start teacher that she had been sexually abused, a complaint was filed by the children services board against Mr. Pachin. The complaint alleged that the child was an abused child pursuant to R.C. 2151.031(A). The child later told the police that it was not her parents that sexually molested her. Thus, the children services board was left without sufficient evidence to support its claim. Consequently, on November 13, 1985, the trial court granted the children services board's oral motion to dismiss the case without prejudice.

Thereafter, the children remained in the custody of their parents until May 12, 1986. In April 1986, the Pachin family was evicted from their Dayton Metropolitan Housing Authority residence on Fielding Drive after neighbors filed complaints about them. After the eviction, the Pachins had no money and no place to go, so they spent a couple of days at the St. Vincent Hotel, a place for the homeless. Then the Salvation Army agreed to put them up for two weeks at the Kettering Inn. After a few weeks, however, the Pachins were advised that they had to leave the Kettering Inn because the Salvation Army was no longer going to support them. Thus, once again the family found themselves homeless. So, on May 12, 1986, the Pachins voluntarily entered into an agreement with the children services board whereby the children services board took temporary custody of the children while the parents looked for a home. Mr. Pachin ended up staying with a friend, while Mrs. Pachin returned to the St. Vincent Hotel. From May 12, 1986 until July 1, 1986, Mr. and Mrs. Pachin independently moved from place to

place. Finally, on July 1, 1986, the Pachins were able to rent a home on Nassau Street in Dayton. Subsequently, on December 19, 1986, Mr. and Mrs. Pachin moved to 33 Pinewood Circle, Trotwood, Ohio, where they are presently residing.

The children services board has retained custody of the children from the May 12th agreement until the present. The children services board provided its own reunification plan during this period until October 7, 1986, when they sought a court-ordered reunification plan. On October 15, 1986, the trial court adopted the children services board's Initial Plan for Reunification pursuant to R.C. 2151.412(B). Upon further review of the reunification plan, the appellants decided they did not like its terms so they filed a motion to vacate the trial court's order of October 15, 1986. On December 2, 1986, the trial court granted the appellants' motion to vacate. On March 3, 1987, the children services board filed a motion to amend its 1985 complaint.[1] The amended complaint alleged the children to be dependent and sought permanent custody of the children.

Although the complaint did not specifically claim that it was seeking permanent custody of the children pursuant to R.C. 2151.353(A)(4), it is clear from its language that this was the statute under which the children services board was proceeding. The complaint stated in pertinent part:

"Mother has been diagnosed as extremely limited intellectually with poor coping and child care skills. Father is on SSI for mental disability. Neither parent is willing to participate in a reunification plan. In the past, the parents have demonstrated poor child care skills including poor supervision. Both parents have significant behavioral and emotional problems with poor judgment, impulsiveness, inability to plan and substance abuse on the part of the father. In the opinion of the agency the parents are unwilling and unable to follow through with a reunification plan and to learn to parent the child in a minimally adequate fashion. No relatives are able to care for the child."

In pertinent part R.C. 2151.353 (A)(4) states:

"(A) If the child is adjudged an abused, neglected or dependent child, the court may make any of the following orders of disposition:

"* * *

"(4) Commit the child to the permanent custody of the county department of human services which has assumed the administration of child welfare, county children services board, or to any other certified organization, if the court determines that the parents have acted in such a manner that the child is a child without adequate parental care, it is likely that the parents would continue to act in such a manner that the child will continue to be a child without adequate parental care if a reunification plan were prepared pursuant to section 2151.412 of the Revised Code, and the permanent commitment is in the best interests of the child. If the court grants permanent custody under this division, the court, upon the request of any party, shall file a written opinion setting forth its findings of fact and conclusions of law in relation to the proceeding."

Upon comparison of the language

---

[1] While the state's decision to reopen the 1985 action through a proposed amended complaint was questionable, we find that no due process rights were violated by such action. The amended complaint clearly and distinctly stated its purpose, and the appellants were properly put on notice of the action against them.

of R.C. 2151.353(A)(4) and that found in the complaint, it is clear that the agency was proceeding pursuant to R.C. 2151.353(A)(4). Subsequently, the trial court concluded that the children were dependent, and it awarded permanent custody to the agency. The appellants now appeal from that judgment, and they raise the following two assignments of error on appeal:

"I. The appellants are clearly denied their constitutional rights of due process of law when a trial court permanently removes their minor children from their custody without first properly obtaining temporary custody as required by law, and without further providing the parents the opportunity to enter into a court-approved comprehensive reunification plan.

"II. A trial court clearly abuses discretion, and fails to follow present case law when it permanently removes the custody of minor children from their natural parents after receiving clear and convincing evidence that the natural parent's situation could ameliorate thereby allowing return of custody of the minor children to their natural parents."

In their first assignment of error, the appellants claim that their constitutional rights to due process were violated in three matters: "The failure to hold a hearing shortly after the removal of the children from the custody of the natural parents, (2) the failure by Montgomery County [Children] Services Board to provide proper measures which would encourage and facilitate the reunification of this family, and (3) the omission of a clear and complete description of the severity of permanent placement in the summons served upon the appellants." For the following reasons, we disagree.

The appellants first claim that they were denied a hearing within seventy-two hours after the children services board received custody of the children. Although the appellants did not specifically state, it is apparent that they are claiming that the seventy-two hour provision of R.C. 2151.314 was not followed. R.C. 2151.314 states in pertinent part:

"When a child is brought before the court or delivered to a place of detention or shelter care designated by the court, the intake or other authorized officer of the court shall immediately make an investigation and shall release the child unless it appears that his detention or shelter care is warranted or required under section 2151.31 of the Revised Code.

"If he is not so released, a complaint under section 2151.27 of the Revised Code shall be filed and an informal detention hearing held promptly, *not later than seventy-two hours* after he is placed in detention, *to determine whether detention or shelter care is required. * * *"* (Emphasis added.)

We find that this statute does not even apply to this case. Here, the children were voluntarily given to the children services board; they were not removed involuntarily from the parents. Therefore, we find that the appellants' argument that they were denied a detention hearing is not well-taken.

The appellants' next allegation is that the children services board failed to encourage and facilitate a reunification plan as required by law. Once again, we find that the appellants have rested on a misapplication of the proper law governing this case.

R.C. 2151.412 requires that the children services board issue an "initial reunification plan" and a "comprehensive reunification plan" to the court after an award of temporary custody has been given to the agency by the court. As we noted above, however, this case did not involve the granting of temporary custody to the children

services board, but was an action for permanent custody pursuant to R.C. 2151.353(A)(4). "R.C. 2151.412 and 2151.414 are applicable only where the child or children have previously been determined dependent, neglected or abused, their temporary custody has been committed to a children services board, a welfare department or a certified organization, and an order is sought changing temporary to permanent custody. These sections are not applicable where the original request was for permanent custody, and an order of temporary custody was issued pending hearing on the complaint as provided by R.C. 2151.33." *In re Covert* (1984), 17 Ohio App. 3d 122, 17 OBR 185, 477 N.E. 2d 678, syllabus.

In *In re Koballa* (Jan. 24, 1985), Cuyahoga App. Nos. 48417 and 48480, unreported, the court stated at 8:

"A comprehensive reunification plan is *only* required when a child is committed to the temporary custody of the department of public welfare pursuant to R.C. 2151.353(A)(2) or (A)(3). Because the temporary custody order in the case *sub judice* was made pursuant to Juvenile Rules 13(A) and 13(D), and *not* R.C. 2151.353(A)(2) or (A)(3), no reunification plan was required." (Emphasis *sic*.)

Although temporary custody was not issued pursuant to R.C. 2151.33 or Juv. R. 13 in this case, we find the facts of this case analogous to those in *In re Covert* and in *In re Koballa.* Here, the temporary custody arrangement was voluntarily entered into, pursuant to the May 12, 1986 agreement, by the parents and the children services board. Subsequently, the children services board sought permanent custody. As was the case in *In re Covert* and *In re Koballa,* we find that a reunification plan was not required in this case, and that the trial court acted properly. The children services board could have simplified the procedural aspects of this case by expressly moving for temporary custody pursuant to R.C. 2151.33 or Juv. R. 13, and then filing for permanent custody pursuant to R.C. 2151.353(A)(4). Nonetheless, we find that the appellants' due process rights were not violated, and that the children services board's and the trial court's actions can be construed to have been consistent with the purposes of R.C. 2151.33, Juv. R. 13, and R.C. 2151.353(A)(4).

We also reject the appellants' third basis for claiming that their due process rights were violated — that the summons did not give an adequate explanation that an award of permanent custody would divest the parents of all parental rights. The appellants rely on R.C. 2151.352(B), which states in pertinent part:

"No order for permanent custody shall be made at the hearing at which the child is adjudicated abused, neglected, or dependent except and unless the complaint alleging the abuse, neglect, or dependency contains a prayer requesting permanent custody and *the summons served on the parents contains a full explanation that the granting of an order for permanent custody permanently divests them of their parental rights* and contains a full explanation of their right to be represented by counsel and to have counsel appointed * * * ." (Emphasis added.)

The following language appeared in bold print in the summons:

"**AN ADJUDICATION MAY RESULT IN AN ORDER OF COMMITMENT OF THE CHILD/ CHILDREN TO THE PERMANENT CUSTODY OF THE SAID AGENCY. THE GRANTING OF AN ORDER OF PERMANENT CUSTODY PERMANENTLY DIVESTS THE PARENT OF ALL PARENTAL RIGHTS TO THE CHILD/ CHILDREN.**"

We believe that this language clearly provided an explanation that granting permanent custody to the agency would divest the parents of their parental rights. We do not find that a more elaborate explanation was required. The purpose of the summons was to place the parents on notice that an action to permanently remove their children from their custody was being instigated against them. The summons in this case served that purpose.

In addition, the following dialogue occurred at the beginning of the trial:

"COURT: Mr. Beyoglides, you talked to your client about the seriousness of this hearing and about permanent custody, and is he and Mrs. Pachin aware of the results of the custody?

"MR. BEYOGLIDES: Correct. They realize that if Children Services Board is granted permanent custody that will divest them of any parenting right they have. That is why we are contesting the matter."

Thus, it is clear from these facts that the parents were aware of the effect of a permanent custody award. Furthermore, we do not find that the parents were in any way denied their constitutional right to due process in this case.

The appellants' first assignment of error is overruled.

In essence, the appellants' second assignment of error contends that the trial court's judgment was against the manifest weight of the evidence. More specifically, the appellants claim that their situation could ameliorate to the point of allowing them to regain custody of their children. Thus, they claim that the trial court abused its discretion by awarding permanent custody to the children services board.

The trial court impliedly relied on R.C. 2151.353(A)(4) in awarding permanent custody to the children ser-

vices board. See R.C. 2151.353(A)(4), *supra.*

The trial court determined that the children were "dependent" as defined in R.C. 2151.04, and it proceeded to award permanent custody of the children to the children services board.

R.C. 2105.04 states:

"As used in Sections 2151.01 to 2151.54, inclusive, of the Revised Code, 'dependent child' includes any child:

"(A) Who is homeless or destitute or without proper care or support, through no fault of his parents, guardian, or custodian;

"(B) Who lacks proper care or support by reason of the mental or physical condition of his parents, guardian, or custodian;

"(C) Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming his guardianship."

There was an abundance of testimony as to the parents' mental and physical disabilities. Mr. Pachin is suffering from an antisocial personality disorder and a narcissistic disorder. One of Mr. Pachin's psychologists, Dr. Barbara Bergman, attached the following definitions to Mr. Pachin's disorders:

"Anti-social personality disorder shows a life adjustment in which the rights and needs of other people are abrogated on a regular basis. Such a person is very egocentric, self-served, concerned about himself. They violate social eviction [*sic*] or laws on a social basis, typically does not view his behavior as out of line but rather rate other people as unfair or unreasonable with him. Narcissistic disorder, to add another dimension to that, is a person who is completely and totally taken with himself[,] overinflates his own abilities, is extremely unrealistic about his worth and his abilities and his importance in the scheme of things."

Dr. Bergman described Mrs. Pachin as suffering from cerebral palsy and being mildly retarded. These analyses of the parents were consistent with the testimony of three other doctors and several caseworkers. Dr. Flexman, another psychologist who counseled the parents, provided the following responses when asked if the parents could rear children:

"I think it would be a real challenge for them that would be very difficult to overcome, especially as the children got older and themselves became more rebellious and more prone to exert themselves. I think it would be a very difficult situation.

"Q. But it would not be impossible?

"A. I would have some great concerns. Nothing is impossible."

The record is replete with testimony that the parents are suffering from mental disorders that would undermine their ability to raise their children. There was testimony that the parents lacked an ability to budget their money and discipline their children. This type of family environment was clearly not beneficial to the children. Overall, we find that there was substantial, credible, and competent evidence to support the trial court's judgment. *C.E. Morris Co.* v. *Foley Construction Co.* (1978), 54 Ohio St. 2d 279, 8 O.O. 3d 261, 376 N.E. 2d 578. Therefore, we find that the trial court did not err in ruling that the children were "dependent" as defined under R.C. 2151.04.

Now we move on to determine if the court properly awarded permanent custody to the children services board. In *In re Cunningham* (1979), 59 Ohio St. 2d 100, 105, 13 O.O. 3d 78, 81, 391 N.E. 2d 1034, 1038, the Ohio Supreme Court stated:

"Although the termination of the rights of a natural parent should be an alternative of 'last resort,' such an extreme disposition is nevertheless expressly sanctioned by the foregoing [R.C. Chapter 2151] when it is necessary for the 'welfare' of the child."

In *In re Cunningham, supra,* the Ohio Supreme Court emphasized that the "best interests" of the child were the paramount consideration in determining whether to award permanent custody to the state. As was the case in adjudicating the children to be dependent, the testimony during the dispositional stage of this trial substantially supported the trial court's finding that, in the best interests of the children, permanent custody should be awarded to the children services board.

The referee, in his report and recommendation, made extensive findings of fact based mainly on the testimonies of caseworkers for the children services board and therapists and doctors who treated and counseled the Pachins. In his findings on disposition, the referee stated:

"The tragedy of this case is not because of the facts to be applied to the law or the decision that has to be made but because the father tried his very best to be able to show at the hearing that he can properly raise his children.

"But the facts cannot be overlooked. The mother had not the emotional strength to appear at a hearing to fight for custody of her children. The mental health of both parents is severe. There has been extreme lack of progress in the parents, coupled with a lack of visitation by the parents with their children. There has been absolute refusal on the part of the parents to work towards reunification almost up to the very end. Promises were made by the father, albeit in good faith, which cannot be kept.

"Therefore, from the evidence and testimony presented, I find as follows:

"1. that the parents have acted in such a manner that the children are

children without adequate parental care;

"2. that it is likely that the parents would continue to act in such a manner that the children will continue to be children without adequate parental care if a reunification plan were prepared pursuant to Section 2151.412 of the Ohio Revised Code;

"3. that commitment to the Permanent Custody of the MCCSB is in the best interests of the said children;

"4. that the said children be committed to the Permanent Custody of the MCCSB; and

"5. that the Trotwood-Madison City School District is to bear the cost of educating the said children."

Upon a thorough review of the record, we find that the referee's findings are well substantiated. Three doctors testified that the parents' mental problems were severe. The mother is mildly retarded and suffering from cerebral palsy. The father has a history of schizophrenia problems and is presently suffering from an antisocial personality disorder. Dr. Flexman testified that he believes the parents would encounter great difficulties in properly raising their children.

There was also substantial testimony that prior efforts of reunification had failed. Peggy Weller, the present caseworker assigned by the Montgomery County Children Services Board to handle the Pachin case, provided the following testimony concerning reunification attempts:

"Based upon the expert witnesses Dr. Bergman and Dr. Flexman, and with the unwillingness of Mr. and Mrs. Pachin to follow the reunification plan, and what I have observed, I have not found any reason to reunify.

"* * *

"Historically, the agency worked with the family since 1983 and we have worked with several issues and a lot of issues around the sexual abuse and protectional issues. We received — first, 4/7/83, which had to do with allegations that Mr. and Mrs. Pachin had locked the children in their rooms. We also received another referral 8/22/83, which stated there was rigid discipline which the children were made to lay [sic] face down on the floor. We received another referral around 2/19/85, where Mr. and Mrs. Pachin threw away the mattresses and forced the children to sleep in bed with the parents. We received, 3/4/85, an allegation of the next door neighbor sexually abusing Paula, and 4/3/86, which the children were later taken into care by that referral based on the history of the family, non-protective issues and issues of sexual and mental health state was [sic] brought up on at least the 3/4/85 referral of the parents being in depression. And with the most recent convicted assault charges against Mr. Pachin and with the recent in-patient hospitalization on March 7, '87 of Mrs. Pachin, it is my observation that the agency has worked with the family and we find them unable and unwilling to work with this agency to reunite, at this time."

Another caseworker, Brenda Love, also testified that the Pachins were uncooperative in attaining the goals of reunification. Finally, a third caseworker, Mary Coughnour, also testified that reunification plans had failed. Furthermore, at one point during the trial, Mr. Pachin stated that he did not know if he would be willing to participate in a reunification plan; however, near the end of trial he recanted this statement, claiming that he was tired of fighting, and stated that he believed he would now participate in a reunification plan if the court so ordered. Based on this evidence, we find that the trial court did not err by concluding that prior attempts at reunification had failed and

that future attempts would likely be unsuccessful too.

In *In re Smart* (1984), 21 Ohio App. 3d 31, 35, 21 OBR 33, 37, 486 N.E. 2d 147, 151, the Court of Appeals for Franklin County stated:

"Even though a juvenile court does have the alternative immediately to grant permanent custody to an appropriate state agency upon determination that a child is abused, neglected or dependent under R.C. 2151.353(A)(4), permanent custody should only be granted at the initial disposition hearing under extreme situations where reunification is not possible. Specifically, a court cannot reach the determination under R.C. 2151.353(A)(4) that 'the child will continue to be a child without adequate parental care if a reunification plan were prepared' where there has been no good faith effort to reunite the child with his parents or evidence that such an effort to reunite would be futile."

In *In re Smart,* the court found that no attempts at reunification had been made, so the court reversed the trial court's award of permanent custody to the agency. In the case *sub judice,* however, there is substantial evidence that attempts of reunification were made and were unsuccessful. Upon review of the foregoing facts and a thorough review of the record, we find that there was substantial, competent, and credible evidence to support the trial court's dispositional finding. Therefore, we hold that the trial court did not abuse its discretion in awarding permanent custody of the appellants' children to the Montgomery County Children Services Board.

The appellants' second assignment of error is overruled, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

WILSON and WOLFF, JJ., concur.